534585

**ORIGINAL** 32

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN, SOUTHERN DIVISION

|  |  |
|---|---|
| ------------------------------------------------ X | JUDGE : Cleland, Robert H. |
| **THERESA SACCO AND JOSEPH PAUL** : | DECK : S. Division Civil Deck |
| **SACCO, Individually And On Behalf of** : | DATE : 11/21/2005 @ 14:52:26 |
| **All Others Similarly Situated,** : | CASE NUMBER : 2:05CV74432 |
|  : | CMP SACCO V. GENERAL MOTORS, TAM |
| **Plaintiffs,** : |  |
|  : |  |
| **-against-** : |  |
|  : |  |
| **GENERAL MOTORS CORPORATION,** : |  |
| **G. RICHARD WAGONER, JR., JOHN** : |  |
| **M. DEVINE and PETER BIBLE,** : | <u>JURY TRIAL DEMANDED</u> |
|  : |  |
| **Defendants.** : | MAGISTRATE JUDGE Carey |
| ------------------------------------------------ X |  |

Plaintiffs Theresa Sacco and Joseph Paul Sacco ("Plaintiffs"), individually and on behalf

of all other persons similarly situated, by their undersigned attorneys, for their Class Action

Complaint against defendants, allege upon personal knowledge as to themselves and their own

acts, and upon information and belief as to all other matters, based on, *inter alia*, the

investigation conducted by and through their attorneys, which included, among other things, a

review of the defendants' public documents, conference calls and announcements made by

defendants, United States and Securities Exchange Commission ("SEC") filings, wire and press

releases published by and regarding General Motors Corporation ("GM" or the "Company")

securities analysts' reports and advisories about the Company, and information readily

obtainable on the Internet, as follows:

1.      This is a securities fraud class action on behalf of public investors who purchased

the common stock of General Motors Corporation, between April 18, 2001 and November 9,

2005, both dates inclusive (the "Class Period"), seeking to pursue remedies under the Securities

Exchange Act of 1934 (the "Exchange Act").  Named as individual defendants are G. Richard Wagoner, Jr., John M. Devine and Peter Bible.

2.  During the Class Period, Defendants' representations regarding the Company's fiscal 2001, 2002, 2003, 2004 and first and second quarter financial results for 2005, the strength of the Company's balance sheet and financial condition, impressive earnings growth, and various other statements concerning being on target for reaching quarterly results and analyst projections, positive trends, anticipated earnings and earnings per share, and expected financial results, were materially false and misleading because defendants knew or recklessly disregarded that the Company's reported financial results and growth were attributable to improper accounting practices which resulted in an overstatement of the Company's revenues, cash flow, earnings and asset valuations.  In truth, the Company's earnings were not increasing in the amounts that had been represented by defendants and the Company's reported earnings statements for the interim periods were inflated in violation of Generally Accepted Accounting Principles ("GAAP").

3.  On October 5, 2005, GM made a partial disclosure of the serious inaccuracies inherent in its financial reporting during the Class Period.  GM announced that it was revising its second quarter 2005 results to reflect a change in the value of its Fuji Heavy stake.  The Company adjusted the stake's value down to $650 million from an estimated $1.5 billion announced previously.  This adjustment increased GM's net loss to $1.07 billion in the quarter, almost four times the loss of $286 million initially reported.

4.  On November 9, 2005, GM gave investors a more complete picture of its faulty accounting practices.  The Company reported that its income for fiscal year 2001 was overstated by as much as $300-400 million—equivalent to about 50% of the profit it reported at

2

the time—by "erroneously" booking credits from suppliers. GM also indicated that the Company was conducting an internal review of the accounting for the credits it had received from suppliers during fiscal years 2001-2005. Moreover, the Company also disclosed that, as of September 30, 2005, its controls and procedures for evaluating assets were materially flawed.

5.     In response to these revelations regarding the depth of the Company's accounting problems, GM's stock price to fell $1.12 per share on unusually heavy trading, representing a 4.5% decline in the stock's value.

## JURISDICTION AND VENUE

6.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. § 240.10b-5].

7.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337 and Section 27 of the Exchange Act [15 U.S.C. § 78aa].

8.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b). GM maintains business in this District and many of the acts and practices complained of herein occurred in substantial part in this District. In addition, the Company's principal executive offices are in this District, Detroit, Michigan.

9.     In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

### Plaintiffs

10.     Plaintiffs Theresa Sacco and Joseph Paul Sacco, as set forth in the accompanying certification, incorporated by reference herein, purchased the common stock of GM at artificially inflated prices during the Class Period and have been damaged thereby.

### Defendants

11.     Defendant GM Companies, Inc. ("G.M.") is a Delaware corporation headquartered at 300 Renaissance Center, Detroit, Michigan 48265-3000. The aggregate number of shares of GM common stock outstanding as of October 31, 2005, is approximately 565.5 million.   As of May 4, 2005, GM had approximately 321,000 full-time employees.   GM's common stock is actively traded on the New York Stock Exchange ("NYSE") under the ticker symbol "GM."

12.     Defendant G. Richard Wagoner. Jr. ("Wagoner") served as GM's Chief Executive Officer and President from June 1, 2000 until May 2003, when Wagoner gave up his position as President and assumed the post of Chairman of the Board, while retaining his position as Chief Executive Officer.   He continues to hold these positions.

13.     Defendant John M. Devine ("Devine") has served as GM's Chief Financial Officer and Vice Chairman of the Board of Directors since January 2001.

14.     Defendant Peter R. Bible ("Bible") served as GM's Chief Accounting Officer throughout the Class Period.

15.     The defendants referenced above in ¶¶ 12-14 are referred to herein as the "Individual Defendants."

4

## SUBSTANTIVE ALLEGATIONS

### Background

16.     Defendant, GM, a Delaware corporation, has two core businesses: Automotive and Other Operations ("Auto and Other"); and Financing and Insurance Operations ("FIO"). GM's Auto and Other operations include four automotive regions: GM North America; GM Europe; GM Latin America/Africa/Mid-East; and GM Asia Pacific. During the relevant period, GM marketed vehicles under the following brand names: Chevrolet; Pontiac; GMC; Oldsmobile; Buick; Cadillac; Saturn; HUMMER; Opel; Vauxhall; Holden; and Saab.

### The Materially False And/Or Misleading Statements

17.     On April 18, 2001, GM issued a press release entitled "GM Earns $225 Million, or $0.50 Per Share, in First Quarter," touting its strong earnings, which it attributed to lower costs and the strong demand for its products. The release stated, in relevant part:

> General Motors Corp. (NYSE: GM) today reported that it earned $225 million, or $0.50 diluted earnings per share, in the first quarter of 2001 excluding special items on revenues of $42.6 billion. The results exclude the $12 million, or $0.03 per share, favorable effect of the initial adoption of an accounting change (SFAS No. 133) relating to the treatment of derivatives. Including the accounting change, GM's first-quarter 2001 income totaled $237 million, or $0.53 per share.

18.     On May 10, 2001, GM filed its quarterly report with the SEC on Form 10-Q for the period ended March 31, 2001. This report was signed defendant Bible and reaffirmed the Company's previously announced financial results.

19.     On July 17, 2001, GM issued a press release entitled "GM Earns $610 Million or $1.26 Per Share, In Second Quarter Net liquidity improves by $1.4 billion." The Company again

5

announced solid earnings, attributing its strong performance to high demand for its vehicles, as

well as the diversity of its products. The release stated, in relevant part:

> General Motors Corp. (NYSE: GM) today reported that it earned $610 million, or
> $1.26 diluted earnings per share, in the second quarter of 2001 - excluding special
> items - on revenues of $46.1 billion.
>
> The second-quarter-2001 results exclude one-time charges totaling $133 million,
> or $0.23 per share, related to the previously announced restructuring of its affiliate
> Isuzu Motors Ltd. GM earned $477 million, or $1.03 per share, in the quarter
> including the charges.

20.     On August 14, 2001, GM filed its quarterly report with the SEC on Form10-Q for

the period ended June 30, 2001. The report was signed by defendant Bible and reaffirmed the

Company's previously announced financial results.

21.     On October 18, 2001, GM issued a press release reporting the Company's

financial results for the third quarter. Once again, GM boasted of strong earnings growth,

announcing record sales for GMAC, its financing division. The release stated, in relevant part:

> General Motors Corp. (NYSE: GM) today reported that it earned $385 million, or
> $0.85 diluted earnings per share, in the third quarter of 2001 - excluding special
> items - on revenues of $42.5 billion. GM's global automotive and financing
> operations earned a total of $527 million during the period, which was partially
> offset by a loss of $142 million at Hughes. These earnings are in line with the
> most recent guidance provided by GM, but down compared with the prior-year
> period.
>
> The third-quarter-2001 results exclude one-time charges totaling $753 million, or
> $1.26 per share, related to the previously announced closing of an assembly plant
> in Canada, and various special items at Hughes, including the resolution of a
> dispute with Raytheon Company relating to the 1997 spin-off and merger of
> Hughes Defense (see Highlights). GM had a loss of $368 million, or $0.41 per
> share, in the quarter including the charges. GM financial results described
> throughout the remainder of this release exclude these charges unless otherwise
> noted. The third-quarter results compare with earnings of $829 million, or $1.55
> per share, on revenue of $42.7 billion, in the third quarter of 2000.

6

22.     On November 14, 2001, GM filed its quarterly report with the SEC on Form 10-Q. The Company's 10-Q was signed by defendant Peter R. Bible and reaffirmed the Company's previously announced financial results.

23.     On January 16, 2002, GM once again announced strong earnings for the fourth quarter, as well as for the full year of 2001. These positive results were attributed to the Company's market share gain as well as its America Rolling market campaign. The Company's release stated, in relevant part:

> Market-share gains spurred by strong new product entries coupled with an intense focus on reducing costs partially offset relentless price pressures as General Motors Corp. (NYSE: GM, GMH) earned $1.5 billion, or $3.23 diluted earnings per share, in calendar-year 2001 on revenues of $177.3 billion, excluding special items. That compares with earnings of $5.0 billion, or $8.58 per share, and revenues of $183.3 billion in the prior year, excluding special items. Including special items, GM had net income of $601 million, or $1.77 per share, in 2001; this compares with $4.5 billion, or $6.68 per share, in the prior year.

> GM earned $255 million, or $0.60 per share, in the fourth quarter of 2001, including the approximately $97 million, or $0.14 per share, unfavorable effect of the currency devaluation in Argentina. This compares with $609 million, or $1.15 per share, in the fourth quarter of 2000, excluding special items. There were no special items in the fourth quarter of 2001.

24.     On March 2, 2002, GM filed its annual report with the SEC on Form 10-K. The Company's Form 10-K was signed by defendants Richard Wagoner, Jr., John M. Devine, and Peter R. Bible. The 10-K, which reaffirmed the Company's previously announced financial results, was also signed by Eric A. Feldstien and Wallace W. Creek.

25.     On April 16, 2002, GM issued a press release announcing its financial results for the first quarter of 2002. The Company reported ever increasing earnings growth, which it attributed to the strong performance of GMAC and GM North America. The release stated, in relevant part:

Strong vehicle sales and improved product mix in North America and a continued focus on cost reduction were key drivers of improved earnings and robust cash generation for General Motors Corp. (NYSE: GM, GMH) in the first quarter of 2002. GM today reported that it earned $791 million, or $1.39 diluted earnings per share of GM $1-2/3 par value common stock, on revenue of $44.3 billion in the first quarter, excluding special items and Hughes. That compares with $321 million, or $0.57 per share, on revenue of $40.7 billion in the first quarter of 2001, also excluding special items and Hughes.

Including special items and Hughes, GM's first-quarter 2002 reported net income totaled $228 million, or $0.57 per share on revenue of $46.3 billion. First-quarter-2002 results included a restructuring charge of $407 million after-tax, or $0.72 per share, related to improving the competitiveness of GM's automotive operations in Europe. In addition, there were three special items at Hughes that had a total net unfavorable effect of $10 million after taxes. GM's results in the first quarter compare with $237 million, or $0.53 per share, on revenue of $42.6 billion in the first quarter of 2001. The first-quarter-2001 results included the $12 million, or $0.03 per share, favorable effect of the initial adoption of an accounting change (SFAS No. 133) relating to the treatment of derivatives.

26.     On May 14, 2002, GM filed its quarterly report with the SEC on Form 10-

Q. The Company's Form 10-Q was signed by defendant Peter R. Bible and reaffirmed

the Company's previously announced financial results.

27.     On July 16, 2002, GM issued a press release announcing its financial results for

the second quarter of 2002. The Company touted its improving financial performance, which it

claimed was due to strong retail sales and growing market share in North America. The release

stated, in relevant part:

General Motors Corp. (NYSE: GM, GMH) today reported earnings nearly doubled in the second quarter of 2002 compared with the prior-year period, reflecting improved retail sales performance, increased production in North America, and a continued focus on cost reduction.

GM earned $1.5 billion, or $2.63 per diluted share of GM $1-2/3 par value common stock, in the second quarter of 2002, excluding Hughes and an after-tax charge of $55 million, or $0.10 per share, for costs associated with end-of-life vehicle recycling in Europe (see Highlights). That compares with $766 million, or $1.37 per share, in the year-ago period, excluding Hughes and a charge of $133

8

million, or $0.23 per share, related to the write-down of Isuzu Motors Ltd. Revenue in the second quarter of 2002 increased to $46.0 billion from $44.2 billion in the same period last year.

Including Hughes and the end-of-life vehicle charge, GM's second-quarter-2002 net income totaled $1.3 billion, or $2.43 per share, on revenue of $48.3 billion. That compares with net income of $477 million, or $1.03 per share, including Hughes and the Isuzu write-down. Revenue in the second quarter of 2001 totaled $46.2 billion.

28.     August 14, 2002, the Company filed its quarterly report with the SEC on Form 10-Q. The Company's Form 10-Q was signed by defendant Peter R. Bible and reaffirmed GM's previously announced financial results.

29.     On October 15, 2002, GM issued a press release regarding the Company's financials for the third quarter of 2002.  The Company announced that earnings had increased a staggering 30% from the same period last year, as a result of its strong cash flow and market share growth.  The release stated, in relevant part:

General Motors Corp. (NYSE: GM, GMH) today reported that earnings in the third quarter of 2002, excluding special items and Hughes, totaled $696 million, or $1.24 diluted earnings per share of GM $1-2/3 par value common stock, an improvement of more than 30 percent compared with the same period last year.

The increase was primarily driven by strong market performance and aggressive cost reductions at GM North America (GMNA), and continuing strength at General Motors Acceptance Corp. (GMAC). The results compare with income of $527 million, or $0.94 per share, in the third quarter of 2001, excluding Hughes and special items.

Including Hughes and special items, GM had a reported net loss of $804 million, or $1.42 diluted earnings per share, compared with a loss of $368 million, or $0.41 per share, in the third quarter of 2001.

30.     On November 14, 2002, GM filed its quarterly report with the SEC on Form 10-Q. The Company's Form 10-Q was signed by defendant Peter R. Bible and reaffirmed the Company's previously announced financial results.

9

31.    On January 16, 2003, the Company issued a press release announcing its financial results for the fourth quarter of 2002, as well as for the entire fiscal year 2002. The Company announced record earnings for the year, which it attributed to increased cash flow as well as increased market share. The release stated, in relevant part:

General Motors Corp. (NYSE: GM, GMH) today reported record revenues and significantly improved earnings in both the calendar year and fourth quarter of 2002.

CALENDAR YEAR 2002

GM earned $1.7 billion on record revenue of $186.8 billion, or $3.35 diluted earnings per share of GM $1-2/3 par value common stock, compared with $601 million, or $1.77 per share, in 2001.

Excluding special items (see "Highlights") and Hughes, 2002 earnings totaled $3.9 billion, or $6.98 per share, nearly double the results in 2001 when GM earned $2.0 billion, or $3.60 per share.

FOURTH QUARTER 2002

Earnings totaled $1.0 billion on record quarterly revenue of $48.7 billion, or $1.71 per share. That compares with $255 million, or $0.60 per share, in the prior-year period. There were no special items other than those at Hughes in the fourth quarter of 2002.

Excluding Hughes and its special items, earnings in the fourth quarter of 2002 totaled $934 million, or $1.67 per share, more than double the $386 million, or $0.69 per share, earned in the prior-year period.

YEAR IN REVIEW

"General Motors Acceptance Corp. (GMAC) achieved its eighth consecutive year of earnings growth and fourth straight year of record earnings ,, truly an outstanding performance, which was achieved despite considerable challenges in the capital markets," Wagoner said.

GM's automotive operations generated approximately $8 billion in cash flow, as total cash generation was about $12 billion in 2002, exceeding the target of $10 billion. "We generated significantly more cash than expected," Wagoner said. "This was achieved despite the fact that the Hughes transaction, which had been a major element of our cash-generation plan, could not be completed. And, we still

10

have a significant store of value in Hughes that we can capitalize on going forward."

32.    On March 5 2003, GM filed its annual report with the SEC on Form 10-K. The Company's Form 10-K was signed by defendants Devine, Wagoner, and Bible and reaffirmed the Company's previously stated financial results. The Form 10-K was also signed by Walter G. Borst, Paul W. Schmidt and John F. Smith.

33.    On April 15, 2003, GM issued a press release announcing its financial results for the first quarter of 2003. The Company announced another quarter of strong financials, apparently resulting from its market growth in North America and Europe. The release stated, in relevant part:

> General Motors Corp. (NYSE: GM, GMII) today reported net income of $1.5 billion, or $2.71 per diluted share of GM's $1-2/3 par value common stock, in the first quarter of 2003, up from $228 million, or $0.57 per share, in the first quarter of 2002.
>
> GM's adjusted income, which excludes a gain from the sale of GM Defense and results from Hughes Electronics, totaled $1 billion, or $1.84 per share, in the first quarter of 2003. GM's adjusted net income in the first quarter of 2002 was $791 million, or $1.39 per share. Automotive and financing revenue rose about 5 percent.
>
> GM's performance in the first quarter of 2003 reflected profitable automotive operations in North America, significantly improved results in Europe and Asia, record earnings at General Motors Acceptance Corp., and continued strong automotive cash flow.
>
> The first-quarter 2003 results include a gain of $505 million after tax, or $0.90 per share, from the previously announced sale of GM Defense. The first-quarter 2002 results included unfavorable special items totaling $417 million, or $0.72 per share.

34.    On May 8, 2003, GM filed its quarterly report with the SEC on Form 10-Q. The Company's Form 10-Q was signed by defendant Bible and reaffirmed the Company's previously announced financial results.

11

35.     On July 17, 2003, GM issued a press release reporting its financial results for the second quarter of 2003. The Company informed investors that it had had yet another dazzling quarter, due to in part to "strong cash generation by our automotive operations and continued strong performance at GMAC, which set another new quarterly earnings record." The release stated, in relevant part:

General Motors Corp. (NYSE: GM, GMH) today reported net income of $901 million, or $1.58 per diluted share of GM's $1?2/3 par value common stock, in the second quarter of 2003, compared with $1.3 billion, or $2.43 per share, in the second quarter of 2002. Total revenues of $48.3 billion were essentially unchanged from the prior-year quarter.

GM's adjusted income, which excludes results from Hughes, totaled $879 million, or $1.57 per share, in the second quarter of 2003. GM's adjusted net income in the second quarter of 2002 was $1.5 billion, or $2.63 per share, excluding Hughes and special items.

GM's second-quarter performance reflected continued strong automotive cash flow, record results at General Motors Acceptance Corp. (GMAC) where earnings of $834 million were nearly double the prior-year quarter, record net income of $163 million at GM Asia Pacific, an overall profit decline in the automotive sector primarily caused by difficult economic conditions in most of GM's automotive regions, and the effects of unfavorable currency-exchange rates in certain regions.

36.     On August 8, 2003, GM filed its quarterly report with the SEC on Form 10-Q. The Company's Form 10-Q was signed by defendant Bible and reaffirmed GM's previously announced financial results.

37.     On October 15, 2003, the Company issued a press release announcing the results for the third quarter of 2003. The Company announced "solid business results" for the quarter. The release stated, in relevant part:

General Motors Corp. (NYSE: GM, GMH) today reported net income of $425 million, or $0.79 per diluted share of GM's $1-2/3 par value common stock, in the third quarter of 2003, compared with a net loss of $804 million, or $1.42 a share,

in the third quarter of 2002. Total net sales and revenues increased 5.4 percent to $45.9 billion.

GM's adjusted income, which excludes results from Hughes, totaled $448 million, or $0.80 per share, in the third quarter of 2003. GM's adjusted net income in the third quarter of 2002, excluding special items and Hughes, totaled $696 million, or $1.24 per share. The third-quarter-2002 results included special items totaling an unfavorable $1.42 billion, or $2.62 per share. There were no special items in the third quarter of 2003.

38.     On November 13, 2003, GM filed its quarterly report with the SEC on Form 10-Q. The Company's Form 10-Q was signed by defendant Bible and reaffirmed the Company's previously announced financial results.

39.     On January 20, 2004, GM issued a press release announcing results for the year 2003 as well as the fourth quarter. The Company announced "solid overall results" for 2003, noting that it was the ninth consecutive year of earnings growth. The release stated, in relevant part:

General Motors Corp. (NYSE: GM) today reported 2003 consolidated net income of $3.8 billion, or $7.14 per diluted share of common stock, compared with $1.7 billion, or $3.35 per share, in 2002. Revenue rose 4.6 percent to $185.5 billion from $177.3 billion in 2002, which is restated to exclude Hughes Electronics.

GM's adjusted income, which excludes special items and results from Hughes Electronics, totaled $3.2 billion, or $5.62 per share, in 2003, compared with $3.9 billion, or $6.98 per share in 2002.

**FOURTH QUARTER 2003**

In the fourth quarter of 2003, General Motors reported consolidated net income of $1.0 billion, or $2.13 per share, compared with $1.0 billion, or $1.71 per share, in the fourth quarter of 2002. Revenue rose 7.7 percent to $49.1 billion from $45.6 billion in the fourth quarter of 2002.

Excluding special items and Hughes, GM earned $838 million, or $1.47 per share, in the fourth quarter of 2003, compared with $934 million, or $1.67 per share, in the year ago period.

40.     On February 29, 2004, GM filed its annual report with the SEC on Form 10-K. The Company's Form 10-K was signed by defendants Wagoner, Devine, and Bible, as well as

Paul W. Schmidt and Walter G. Borst and reaffirmed the Company's previously announced financial results.

41.    On April 20, 2004, GM issued a press release announcing the results for the first quarter of 2004. The Company boasted of a 24% increase in earnings compared to the prior year, apparently resulting from strong international demand for its products. The release stated, in relevant part:

> General Motors Corp. (NYSE: GM) today reported earnings of $1.3 billion, or $2.25 per diluted share of GM common stock, in the first quarter of 2004. These results represent an increase of 24 percent from the year-ago period, when GM earned $1.0 billion, or $1.84 per share, from continuing operations and before special items. Revenue rose 3.1 percent to $47.8 billion.

42.    On May 6, 2004, GM filed its quarterly report with the SEC on Form 10-Q. The Company's Form 10-Q was signed by defendant Peter R. Bible, and reaffirmed the Company's previously announced financial results.

43.    On July 21, 2004, the Company issued a press release announcing its results for the second quarter of fiscal year 2004. The Company again pointed to increased earnings, supposedly due to GMAC's "record breaking performance." The release stated, in relevant part:

> General Motors Corp. (NYSE: GM) today reported earnings from continuing operations of $1.3 billion, or $2.36 per diluted share, in the second quarter of 2004. These results compare with earnings of $879 million, or $1.57 per share, in the second quarter of 2003. Revenue rose 7.1 percent to $49.1 billion.

44.    On August 4, 2004, GM filed its quarterly report with the SEC on Form 10-Q. The Company's Form 10-Q was signed by defendant Bible and reaffirmed the Company's previously announced financial results

45.    On October 14, 2004, the Company issued a press release announcing its results for the third quarter of fiscal year 2004. The release stated, in relevant part:

> General Motors Corp. (NYSE: GM) today reported net income of $440 million, or $0.78 per diluted share, in the third quarter of 2004. These results are at the low

14

end of the range of GM's earnings guidance provided in July. In the year-ago quarter, GM reported net income of $425 million, or $0.79 per share, and earnings from continuing operations of $448 million, or $0.80 per share. Revenue rose 3 percent to $44.9 billion.

46.     On November 10, 2004, GM filed its quarterly report with the SEC on Form 10-Q. The Company's Form 10-Q was signed by defendant Bible and reaffirmed the Company's previously announced financial results.

47.     On January 19, 2005, the Company issued a press release announcing its financial results for the fourth quarter of 2004, as well as the fiscal year 2004. The Company touted record earnings and revenues for the year, which it attributed to its high sales volume as well strong earnings from GMAC, its financing arm. The release stated, in relevant part:

> General Motors Corp. (NYSE: GM) today reported adjusted 2004 earnings from continuing operations of $3.6 billion, or $6.40 per diluted share, led by record earnings from financial services and a 12-percent improvement in automotive earnings. These results, which were in line with GM's original guidance, compare to earnings of $3.2 billion, or $5.62 per share, in 2003. Adjusted revenue rose 4.5 percent to a record $193 billion.
>
> Consolidated net income for 2004, including special items, totaled $3.7 billion, or $6.51 per share, compared with $3.8 billion, or $7.14 per share, in 2003.
>
> **Fourth Quarter**
>
> GM's adjusted earnings from continuing operations totaled $569 million, or $1.01 per share in the fourth quarter of 2004, down from $838 million, or $1.47 per share in the fourth quarter of 2003. Including special items and discontinued operations, GM reported net income of $630 million, or $1.11 per share in the fourth quarter of 2004, down from $1.0 billion, or $2.13 per share in the year- ago period. Adjusted revenue rose 4.7 percent to $51.2 billion.

48.     On March 16, 2005, GM filed its annual report with the SEC on Form 10-K. The Company's Form 10-K was signed by defendants Devine, Bible, and Wagoner. It was also

15

signed by Walter Borst and Paul W. Schmidt and reaffirmed the Company's previously announced financial results.

49.     In a conference call held in March 2005, Defendant Devine represented to investors that GM did not accept rebates from suppliers for cost savings. Such practices have been extremely controversial in the automobile industry. According to Devine, *"GM's "policy is no rebates from suppliers."* (emphasis added).

50.     On April 19, 2005, the Company issued a press release announcing results for the first quarter of fiscal 2005. The release stated, in relevant part:

General Motors Corp. (NYSE: GM) today reported a loss of $839 million, or $1.48 per diluted share in the first quarter of 2005, excluding special items and a tax-rate adjustment. These results, in line with the guidance GM issued on March 16, 2005, compare to net income of $1.2 billion, or $2.12 per share, in the first quarter of 2004. Revenue fell 4.3 percent to $45.8 billion.

Consolidated net income for the first quarter of 2005, including special items, was a loss of $1.1 billion, or $1.95 per share. The special items include charges for restructuring in Europe, U.S. salaried attrition programs, and facility impairments, partially offset by recognition of the recurring tax benefits above those reflected in the 15-percent rate used in GM's adjusted earnings. These items had a net unfavorable effect of $265 million, or $0.47 per share in the first quarter of 2005. There were no special items in the first quarter of 2004.

51.     On May 10, 2005, GM filed its quarterly report with the SEC on Form 10-Q. The Company's Form 10-Q was signed by defendant Bible and reaffirmed the Company's previously announced financial results.

52.     On July 20, 2005, GM issued a press release announcing its revenues for the second quarter of fiscal year 2004. The Company reported an adjusted loss of $.56 per share, yet maintained that its global sales and market share were increasing. The release stated, in relevant part:

16

General Motors Corp. (NYSE: GM) today reported a loss of $318 million, or $0.56 per diluted share, in the second quarter of 2005, excluding special items and a tax-rate adjustment. These results compare with net income of $1.4 billion, or $2.42 per share, in the second quarter of 2004. Revenue was $48.5 billion, compared with $49.3 billion a year ago.

For the second quarter of 2005, GM reported a loss of $286 million, or $0.51 per share, including special items. The special items include a $126-million restructuring charge at GM Europe, and recognition of the recurring tax benefits above those reflected in the 15-percent rate used in GM's adjusted earnings. These items had a net favorable effect of $32 million, or $0.05 per share.

53.     On October 5, 2005, GM announced that the value of its stake in Fuji Heavy was significantly less than previously announced (see below).

54.     On October 17, 2005, the Company issued a press release announcing its financial results for the third quarter of fiscal year 2005.  GM reported a loss of $1.92 per diluted share, but nevertheless continued to tout its global market share.  The release stated, in relevant part:

General Motors Corp. (NYSE: GM) today reported a loss of $1.1 billion, or $1.92 per diluted share, in the third quarter of 2005, excluding special items and a tax-rate adjustment. These results compare with net income of $315 million, or $0.56 per share, in the third quarter of 2004. Revenue rose more than 5 percent to $47.2 billion.

Including special items, GM reported a loss of $1.6 billion, or $2.89 per share in the third quarter of 2005. The special items include a non-cash charge of $805 million for asset impairments primarily in North America and Europe and restructuring charges at GM Europe of $56 million. These were partially offset by a tax-rate normalization totaling $311 million.

## THE FRAUDULENT NATURE OF THE FOREGOING STATEMTNS

55.     The statements referenced above in ¶¶ 17-54 were each materially false and/or misleading when made as they misrepresented and/or conveniently omitted the following adverse facts which then existed and disclosure of which was necessary to make the statements made not false and/or misleading, including:

17

1) GM's earnings during the Class Period were materially inflated because the Company recognized supplier credits and rebates as income in the year in which they were received rather than in the future periods to which they were properly attributable;

2) despite GM's assertions to the contrary, it continuously accepted rebates from its suppliers for projected cost savings, and that the accounting for such rebates were material to the Company's reported earnings;

3) the value of the Company's stake in Fuji Heavy was inflated by nearly $1 billion.

4) the Company's controls and procedures for evaluating assets were materially flawed.

## THE TRUTH SLOWLY EMERGES

56.     On October 5, 2005, GM began the process of informing investors that the Company's accounting practices were faulty and that its reported revenue growth was wildly inflated. The Company said it was revising second quarter results to reflect a change in the value of its stake in Fuji Heavy. The Company adjusted the value of this stake down to $650 million from an estimated $1.5 billion. This adjustment increased the Company's net loss for the quarter to $1.07 billion, almost four times the initially reported loss of $286 million. After this announcement, GM's share price dropped from $30.09 to $28.10 on unusually heavy trading volume.

57.     On November 9, 2005, after the market closed, GM filed a Form 8-K with the SEC disclosing that the Company "has been conducting an internal review of credits received from suppliers and the appropriateness of its accounting treatment for them during the years 2000-2005." The Company also noted that this issue of receiving credits from suppliers "is one of the matters that is also being investigated by the SEC." The 8-K stated, in relevant part:

The review of supplier credits is ongoing and GM has not reached final
conclusions about this matter. However, the review to date indicates that GM
erroneously recognized some supplier credits as income in the year in which they
were received rather than in the future periods to which they were attributable.
Based on the information to date, GM currently estimates that its net income from
continuing operations for 2001 was overstated by approximately $300 million to
$400 million (or about 25% to 35%) due to this error. Accordingly, although the
final restatement amounts have not yet been determined, GM has determined to
restate its financial statements for 2001, and the restatement is expected to be
material to the financial statements previously reported for that year. GM will also
restate financial statements for periods subsequent to 2001 that may be affected
by the erroneous accounting. However, the effect of any such restatement in
subsequent periods is expected to be immaterial to those financial statements.

GM anticipates that it will complete the review referred to above and take any
appropriate action to correct previously reported financial statements prior to the
filing of its annual report on Form 10-K for 2005. On November 8, 2005, the
Audit Committee of the Board of Directors concluded that, due to the likelihood
of a material restatement of GM's financial statements with respect to 2001,
investors should no longer rely on GM's previously filed financial statements for
that year, nor the related auditors'reports thereon.

The Audit Committee of the Board of Directors of GM has discussed this matter
with its independent registered public accounting firm, Deloitte & Touche LLP.

58.     That same day, GM revealed that it had "evaluated the effectiveness of

GM's disclosure controls and procedures" in assessing whether or when certain assets

should be reclassified as impaired and written off according to accounting rules.   GM

said defendants Wagoner and Devine had determined that as of Sept 30, 2005, its controls

were not effective at the "reasonable assurance level" as defined by SEC guidelines.


59.     The financial markets were stunned by these revelations.   By the end of the trading

session on November 10, 2005, GM's stock fell $1.12 per share, losing 4.5% of its value in one

day to close at $23.51 per share.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

60.     Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the securities of GM between April 18, 2001 and November 9, 2005, both dates inclusive (the "Class Period"), and who were damaged thereby (the "Class"). Excluded from the Class are defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

61.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, GM common shares were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by GM or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

62.     Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

63.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

64.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by defendants' acts as alleged herein;

- whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of GM;

- whether the Individual Defendants caused GM to issue false and misleading financial statements during the Class Period;

- whether defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the market prices of GM securities during the Class Period were artificially inflated because of the defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

65.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

66.     Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- defendants made public misrepresentations or failed to disclose material facts during the Class Period;
- the omissions and misrepresentations were material;
- the securities of the Company traded in an efficient market;

21

· the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

· Plaintiffs and members of the Class purchased their GM stock between the time the defendants failed to disclose or misrepresented material facts and the time the true facts disclosed, without knowledge of the omitted or misrepresented facts.

67. Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

## CLAIMS FOR RELIEF

## COUNT I

### (Against All Defendants For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder)

68. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

69. This Count is asserted against defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

70. During the Class Period, defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiffs and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statement made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of GM's

22

common stock; and (iii) cause Plaintiffs and other members of the Class to purchase GM's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

71.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for GM common stock. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about GM's finances and business prospects.

72.     By virtue of their positions at GM, defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative, defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to defendants. Said acts and omissions of defendants were committed willfully or with reckless disregard for the truth. In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

73.     Defendants were personally motivated to make false statements and omit material information necessary to make the statements not misleading in order to personally benefit from GM's bonus policy, as well as the sale of GM common stock from their personal portfolios.

23

74.     Information showing that defendants acted knowingly or with reckless disregard for the truth is peculiarly within defendants' knowledge and control. As the senior managers and directors of GM, the Individual Defendants had knowledge of the details of GM's internal affairs.

75.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of GM. As officers and directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to GM's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of GM common stock was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning GM's business and financial condition which were concealed by defendants, Plaintiffs and the other members of the Class purchased GM common stock at artificially inflated prices and relied upon the price of the stock, the integrity of the market for the stock and/or upon statements disseminated by defendants and were damaged thereby.

76.     During the Class Period, GM common stock was traded on an active and efficient market. Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which the defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased shares of GM common stock at prices artificially inflated by defendants' wrongful conduct. Had Plaintiffs and the other members of the Class known the truth, they would not have purchased said shares or would not have purchased them at the inflated prices that were paid. At the time of the purchases by

24

Plaintiffs and the Class, the true value of GM stock was substantially lower than the prices paid by Plaintiffs and the other members of the Class. The market price of GM common stock declined sharply upon public disclosure of the facts alleged in this complaint.

77.     By reason of the conduct alleged herein, defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10-5 promulgated thereunder.

78.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchase and sales of the Company's securities during the Class Period.

## COUNT II

### (Violations of Section 20(a) of the Exchange Act Against The Individual Defendants)

79.     Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

80.     (a)     During the Class Period, defendant Wagoner participated in the operation and management of GM, and conducted and participated, directly and indirectly, in the conduct of GM's business affairs. Because of Wagoner's senior position, he knew the adverse non-public information about GM's misstatement of income and expenses and false financial statements.

(b)     As an officer and director of a publicly owned company, Wagoner had a duty to disseminate accurate and truthful information with respect to GM's financial condition and results of operations, and to correct promptly any public statements issued by GM which had become materially false or misleading.

(c)     Because of his positions of control and authority as a senior officer and chairman of GM, Wagoner was able to, and did, control the contents of the various reports, press

25

releases and public filings which GM disseminated in the marketplace during the Class Period concerning GM's results of operations. Throughout the Class Period, Wagoner exercised his power and authority to cause GM to engage in the wrongful acts complained herein. Wagoner therefore, was a "controlling person" of GM within the meaning of Section 20(a) of the Exchange Act. In this capacity, he participated in the unlawful conduct alleged which artificially inflated the market price of GM common stock.

81.     (a)     During the Class Period, defendant Devine participated in the operation and management of GM, and conducted and participated, directly and indirectly, in the conduct of GM's business affairs. Because of Devine's senior position, he knew the adverse non-public information about GM's misstated income and expenses and false financial statements.

        (b)     As an officer of a publicly owned company, Devine had a duty to disseminate accurate and truthful information with respect to GM's financial condition and results of operations, and to correct promptly any public statements issued by GM which had become materially false or misleading.

        (c)     Because of his positions of control and authority as a senior officer of GM, Devine was able to, and did, control the contents of the various reports, press releases and public filings which GM disseminated in the marketplace during the Class Period concerning GM's results of operations. Throughout the Class Period, Devine exercised his power and authority to cause GM to engage in the wrongful acts complained herein. Devine, therefore, was a "controlling person" of GM within the meaning of Section 20(a) of the Exchange Act. In this capacity, he participated in the unlawful conduct alleged which artificially inflated the market price of GM common stock.

82.    (a)    During the Class Period, defendant Bible participated in the operation and management of GM, and conducted and participated, directly and indirectly, in the conduct of GM's business affairs.  Because of Bible's senior position, he knew the adverse non-public information about GM's misstated income and expenses and false financial statements.

(b)    As an officer of a publicly owned company, Bible had a duty to disseminate accurate and truthful information with respect to GM's financial condition and results of operations, and to correct promptly any public statements issued by GM which had become materially false or misleading.

(c)    Because of his positions of control and authority as a senior officer of GM, Bible was able to, and did, control the contents of the various reports, press releases and public filings which GM disseminated in the marketplace during the Class Period concerning GM's results of operations.  Throughout the Class Period, Bible exercised his power and authority to cause GM to engage in the wrongful acts complained herein.  Bible, therefore, was a "controlling person" of GM within the meaning of Section 20(a) of the Exchange Act.  In this capacity, he participated in the unlawful conduct alleged which artificially inflated the market price of GM common stock.

83.    Each of the Individual Defendants, therefore, acted as a controlling person of GM. By reason of their senior management positions and directors of GM, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, GM to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of GM and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

84     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20 of the Exchange Act for the violations of committed by GM.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment against defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23, Federal Rules of Civil Procedure, and certifying the Plaintiffs as the Class representatives and Lead Plaintiffs;

B.     Requiring defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

### DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs hereby demands trial by jury of all issues that may be so tried.

Dated: November 17, 2005

ELWOOD S. SIMON & ASSOCIATES, P.C.

By:_____
   Elwood S. Simon (P10499)
   355 S. Old Woodward Avenue, Suite 250
   Birmingham, MI 48009
   Telephone: (248) 646-9730
   Facsimile: (248) 258-2335

*Liaison Counsel for Plaintiffs*

28

**POMERANTZ HAUDEK BLOCK**
**GROSSMAN & GROSS LLP**
Stanley M. Grossman
Marc I. Gross
100 Park Avenue, 26th Floor
New York, New York 10017
Telephone: 212-661-1100
Facsimile: 212-661-8665


**POMERANTZ HAUDEK BLOCK**
**GROSSMAN & GROSS LLP**
Patrick V. Dahlstrom
One North LaSalle Street, Suite 2225
Chicago, Illinois 60602
Telephone: 312-377-1181
Facsimile: 312-377-1184

**Attorneys for Plaintiffs**

## CERTIFICATION OF THERESA SACCO
## PURSUANT TO FEDERAL SECURITIES LAWS

1.     I, Theresa Sacco, make this declaration on behalf of myself and my husband, Joseph Paul Sacco, as joint owners of the securities, pursuant to Section 21D(a)(2) of the Securities Exchange Act of 1934, as amended by the Private Securities Litigation Reform Act of 1995.

2.     I have reviewed the Complaint against General Motors Corporation ("General Motors") and certain of its officers and/or directors and authorize the filing of a comparable Complaint on my behalf.

3.     I did not purchase General Motors common stock at the direction of plaintiffs' counsel or in order to participate in any private action arising under the Securities Exchange Act of 1934.

4.     I am willing to serve as a representative party on behalf of a Class as set forth in the Complaint, including providing testimony at deposition and trial, if necessary. I understand that the Court has the authority to select the most adequate lead plaintiff in this action and that the firm of Pomerantz Haudek Block Grossman & Gross LLP may exercise its discretion in determining whether to move on my behalf for appointment as lead plaintiff.

5.     During the Class Period, April 18, 2001 through November 9, 2005, I made the following transactions in General Motors Corporation common stock:

| Date | Purchase or Sale | No. of Shares | Price Per Share |
|------|------------------|---------------|-----------------|
| 3/4/05 | Purchase | 200 | $36.40 |

JS 44
(REV. 12/96)

# CIVIL COVER SHEET

## COUNTY IN WHICH ACTION AROSE _____ WAYNE

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

### I. (a) PLAINTIFFS
Theresa Sacco and Joseph Paul Sacco

### DEFENDANTS
General Motors Corporation, G. Richard Wagoner, Jr., John M. Devine and Peter Bible

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF __Middlesex, MA__
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
TRACT OF LAND INVOLVED.

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)
Elwood S. Simon (P20499)
Elwood S. Simon & Associates, P.C.
355 S. Old Woodward Ave., Suite 250
Birmingham, MI 48009    (248) 646-9730

ATTORNEYS (IF KNOWN)

ROBERT H. CLELAND

### II. BASIS OF JURISDICTION (PLACE AN "X" IN ONE BOX ONLY)

☐ 1 U.S. Government Plaintiff

☒ 3 Federal Question
(U.S. Government Not a Party)

☐ 2 U.S. Government Defendant

☐ 4 Diversity
(Indicate Citizenship of Parties in Item III)

### III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN "X" IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)
(For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

### VI. ORIGIN (PLACE AN "X" IN ONE BOX ONLY)

☒ 1 Original Proceeding

☐ 2 Removed from State Court

☐ 3 Remanded from Appellate Court

☐ 4 Reinstated or Reopened

☐ 5 Transferred from another district (specify)

☐ 6 Multidistrict Litigation

☐ 7 Appeal to District Judge from Magistrate Judgment

### V. NATURE OF SUIT (PLACE AN "X" IN ONE BOX ONLY)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | PERSONAL INJURY — PERSONAL INJURY | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane — ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 423 Withdrawal 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander — ☐ 365 Personal Injury - Product Liability | | | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability — ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | PROPERTY RIGHTS | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability — PERSONAL PROPERTY | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle — ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☒ 850 Securities/Commodities/Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability — ☐ 371 Truth in Lending | ☐ 690 Other | SOCIAL SECURITY | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury — ☐ 380 Other Personal Property Damage | LABOR | ☐ 861 HIA (1395ff) | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | ☐ 380 Other Personal Injury — ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 862 Black Lung (923) | ☐ 892 Economic Stabilization Act |
| REAL PROPERTY | CIVIL RIGHTS — PRISONER PETITIONS | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 441 Voting — ☐ 510 Motions to Vacate Sentence | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | ☐ 864 SSID Title XVI | ☐ 894 Energy Allocation Act |
| ☐ 220 Foreclosure | ☐ 442 Employment — HABEAS CORPUS: | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/Accommodations — ☐ 530 General | ☐ 790 Other Labor Litigation | FEDERAL TAX SUITS | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 240 Torts to Land | ☐ 444 Welfare — ☐ 535 Death Penalty | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights — ☐ 540 Mandamus & Other | | ☐ 871 IRS - Third Party 26 USC 7609 | ☐ 890 Other Statutory Actions |
| ☐ 290 All Other Real Property | ☐ 550 Civil Rights / ☐ 555 Prison Condition | | | |

### VI. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY.)

Violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. Sec. 78j(b) and 78t(a).

### VII. REQUESTED IN COMPLAINT:
☒ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☒ YES   ☐ NO

### VIII. RELATED CASE(S) IF ANY (See instructions):
JUDGE _____     DOCKET NUMBER _____

DATE  11/21/05

SIGNATURE OF ATTORNEY OF RECORD

FOR OFFICE USE ONLY

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG JUDGE _____

# PURSUANT TO LOCAL RULE 83.11

1.        Is this a case that has been previously dismissed?                    ☐ Yes
                                                                                ☒ No

If yes, give the following information:

Court: _____

Case No.: _____

Judge: _____


2.        Other than stated above, are there any pending or previously
          discontinued or dismissed companion cases in this or any other       ☐ Yes
          court, including state court? (Companion cases are matters in which   ☒ No
          it appears substantially similar evidence will be offered or the same
          or related parties are present and the cases arise out of the same
          transaction or occurrence.)

If yes, give the following information:

Court: _____

Case No.: _____

Judge: _____

Notes : _____